FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 1 4 2010

JAMES N. HATTEN, CLERK
By: _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

RWS

| | | |
|---|---|---|
| Stuart Tasman, | ) | |
| Paul W. Broome, | ) | |
| Mark Gottlieb, | ) | |
| Mark Hall, | ) | |
| Ivo Horak, | ) | |
| Carl Levine, | ) | |
| Darren Levine, | ) | |
| A. Dylan Reach, | ) | |
| Rohit Sharma, | ) | |
| James A. Stewart, | ) | |
| Tim Tippett, | ) | Civil Action No. |
| Kurt E. Treu, | ) | |
| Daniel J. Tulman, | ) | **1: 1 0 . CV - 1807** |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Brican America, Inc., | ) | |
| Brican America, LLC, | ) | |
| Brican Financial Services, LLC, | ) | |
| Jean Francois Vincens, | ) | |
| Jacques Lemacon, | ) | |
| JJR Investments, LLC, | ) | |
| Lifestyle of Vision, Inc., | ) | |
| NCMIC Finance Corporation, | ) | |
| Salvatore DeCanio, Jr., | ) | |
| Viso Lasik Medspas, LLC, | ) | |
| | ) | |
| Defendants | ) | |

1

# Complaint – Class Action

COMES NOW Plaintiff **Stuart Tasman** ("Plaintiff"), on behalf of himself and all others similarly situated, and brings this class action suit against defendants **Brican America, Inc.** ("Brican Inc."), a Florida corporation; **Brican America, LLC** ( "Brican LLC"), a Florida limited-liability company; **Brican Financial Services, LLC** ("Brican Financial"), a Florida limited-liability company; **Jacques Lemacon** ("Lemacon"), a resident of Florida; **Jean-Francois Vincens** ("Vincens"), a resident of Florida; **JJR Investments, LLC** ("JJR Investments"), a Florida limited-liability company; **Lifestyle of Vision, Inc.**, a Florida corporation; **NCMIC Finance Corporation** d/b/a Professional Solutions Financial Services ("NCMIC"), an Iowa corporation; **Salvatore DeCanio** ("DeCanio"), a resident of Florida; and **Viso Lasik Medspas, LLC** ("Viso Lasik"), a Florida limited-liability company. Plaintiff alleges following claims:

> **Claim I** for violations of the Georgia Racketeer Influenced and Corrupt Organizations Act (RICO) and Federal RICO Act
>
> **Claim II** for conspiracy to violate the Georgia Racketeer Influenced and Corrupt Organizations Act and Federal RICO Act
>
> **Claim III** for Fraudulent Misrepresentation

2

**Claim IV** for Breach of Contract

**Claim V** for Unjust Enrichment

**Claim VI** for Unconscionability

**Claim VII** for violations of the Uniform Deceptive Trade
Practices Act

## PRELIMINARY STATEMENT

This case arises from a scheme instigated by Defendants Jean-Francios Vincens
and Jacques Lemacon. From 2004 through 2006, Defendants and Lemacon formed
Brican Inc. and Brican LLC (collectively "Brican"). Each company was owned and
controlled exclusively by Vincens and Lemacon. For a period of years, Brican
entered into leasing agreements with each of the Plaintiffs and other similarly
situated individuals, as well as Defendant NCMIC and Defendant Viso Lasik
Medspa. The scheme consisted of three agreements, all made with Brican. Through
these agreements, Brican manipulated funding sources for various investments and
derived millions of dollars in revenue while simultaneously paying out only
enough to sustain the fraud.

The first step in the plan was for Brican sell advertising space on a display
system it created, known as the Exhibio display system. The system was designed
to be used in doctors' and other medical professionals' waiting rooms and displays

3

advertisements to patients while they await their appointment. In order to distribute these systems so as to make the venture profitable, Brican entered into a series of lease agreements with optometrists, dentists, and other medical professionals, whereby the medical professional would lease the Exhibio system and use it as a display in his office's waiting room.

To induce the Plaintiffs to enter into the agreement, Brican promised that it would make regular quarterly payments to the Plaintiffs from the advertising revenue it generated by selling advertising space on the systems. If Brican failed to make these payments to the Plaintiffs, Brican promised it would repurchase the lease agreements. In order to generate this advertising revenue, Brican allegedly contracted with Viso Lasik Medspas. Brican repeatedly warranted to the Plaintiffs that Viso Lasik would purchase advertising space, and that the funds generated from this purchase would be paid to the Plaintiffs. In reliance on Brican's statements, each Plaintiff entered into a leasing agreement. Brican then sold or assigned these leasing agreements to NCMIC, a third-party financing company, for an upfront payment of $24,000 per lease.

The fraud arises in that Brican never had an agreement to sell advertising space on the Exhibio system and never intended to honor its commitment to repurchase the leases if it failed to remit payment to the Plaintiffs. Vincens and Lemacon, who

4

shared control of Brican, shared control of Viso Lasik. They were fully aware that Viso Lasik did not have the financial means to purchase advertising space from Brican. As such, Brican never had any intention to honor its commitments or promises, and misrepresented facts in existence at the time of the signing of the leasing agreements.

Brican sought only to enter into lease agreements and then to assign those agreements for an upfront payment from NCMIC. Brican did not attempt to secure any advertising contracts or derive any other revenue which would have allowed it to meet its obligations to the Plaintiffs. Any funds that were paid to Plaintiffs were paid out of the cash generated from the assignments of the leases to NCMIC, and paid only to sustain the fraud to lure in subsequent investors.

In short, Defendants enacted a Ponzi scheme and deprived Plaintiffs of substantial sums of money through fraud and trick.

## II. JURISDICTION AND VENUE

1. **Personal Jurisdiction.** Pursuant to O.C.G.A. 9-10-91, this Court has personal jurisdiction over each defendant is proper because at all relevant times each has had systematic, continuous, and purposeful contacts within the forum State and each has transacted business in the State of Georgia. All acts giving rise to these causes of action occurred within the Northern

5

District of Georgia.

2. **Subject Matter Jurisdiction.** Jurisdiction is proper in the Court pursuant to 28 U.S.C. 1332 because there is complete diversity between all Plaintiffs and all Defendants and the amount in controversy is greater than $75,000.

3. **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. 1391 because at the time of the filing of this action each Defendant is subject to personal jurisdiction in the Northern District of Georgia.

### III. PARTIES

*Plaintiffs*

4. **Plaintiff and Class Representative Stuart Tasman** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

5. **Plaintiff and Class Member Paul W. Broome** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

6. **Plaintiff and Class Member Mark Gottlieb** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

7. **Plaintiff and Class Member Mark Hall** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

8. **Plaintiff and Class Member Ivo Horak** is a licensed optometrist in the

State of Georgia and a citizen and resident of the State of Georga.

9. **Plaintiff and Class Member Carl Levine** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

10. **Plaintiff and Class Member Darren Levine** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

11. **Plaintiff and Class Member A. Dylan Reach** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

12. **Plaintiff and Class Member Rohit Sharma** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

13. **Plaintiff and Class Member James A. Stewart** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

14. **Plaintiff and Class Member Tim Tippett** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

15. **Plaintiff and Class Member Kurt E. Treu** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

16. **Plaintiff and Class Member Daniel J. Tulman** is a licensed optometrist in the State of Georgia and a citizen and resident of the State of Georga.

*Defendants*

17. **Defendant Brican America, Inc. ("Brican Inc.")** is a Florida corporation

7

incorporated on 30 July 2004. Its principal address is 5301 Blue Lagoon Drive, Suite 520  Miami, FL 33126. Its registered agent is Defendant Jean-Francois Vincens. Brican America Inc. registered as a foreign corporation in the State of Georgia on 1 June 2005. Its registered agent in Georgia is National Registered Agents, Inc., located at 3675 Crestwood Parkway, Suite 350 Duluth, GA, 30096 in Gwinnett County. The officers of Brican America, Inc. are Defendants Vincens and Lemacon.

18. Brican Inc. is in the business of leasing advertising equipment to medical, dental, optometry and chiropractic providers.

19. **Defendant Brican America, LLC ("Brican LLC")** is a limited liability company existing under the laws of the State of Florida. It was registered on 24 August 2006. Its principal address is 5301 Blue Lagoon Drive, Suite 520 Miami, FL 33126. Its registered agent is Yvette Harrell, 5301 Blue Lagoon Drive, Suite 520 Miami, FL 33126. Its managing members are Defendants Vincens and Lemacon. Brican America, LLC was registered as a foreign LLC in the State of Georgia on 11 March 2007. Its registered agent in Georgia is Incorp Services, Inc., 2000 Riveredge Parkway NW Suite 885, Atlanta, GA 30328 in Fulton County.

20. Brican LLC is in the business of leasing advertising equipment to medical,

8

dental, optometry and chiropractic providers.

21. **Defendant Brican Financial Services, LLC ("Brican Financial")** is a limited liability company existing under the laws of the State of Florida. It was registered on 17 April 2009. Its principal address is 5301 Blue Lagoon Drive, Suite 520 Miami, FL 33126. Its registered agent is Yvette Harrell, 5301 Blue Lagoon Drive, Suite 520 Miami, FL 33126. Its managing members are Defendants Vincens and Lemacon. Brican Financial Services, LLC is registered as a foreign limited liability company in the State of Georgia and is authorized to transact business there at all times relevant to this lawsuit. It was registered on 22 November 2009. Its registered agent in Georgia is Incorp Services, Inc., 2000 Riveredge Parkway NW Suite 885, Atlanta, GA 30328, Fulton County

22. Brican Financial Services was formed to act as a financing party to equipment leases.

23. **Defendant Jean Francois Vincens ("Vincens"),** also known by the name **Jeff Vincens**, is a resident of the State of Florida. Vincens owns and controls a 50% interest in Brican America, Inc., Brican America, LLC, Brican Financial Services, LLC, and JJR Investments. Through JJR Investments, Vincens owns and controls a 33% interest in Viso Lasik Medspas.

24. **Defendant Jacques Lemacon ("Lemacon")** is a resident of the State of Florida. Lemacon owns and controls a 50% interest in Brican America, Inc., Brican America LLC, Brican Financial Services, LLC, and JJR Investments. Through JJR Investments, Lemacon owns and controls a 33% interest in Viso Lasik Medspas.

25. **Defendant JJR Investments, LLC ("JJR Investments")** is a limited liability company created under the laws of the State of Florida on 18 July 2006. Its principal address is 2332 Galiano St., Second Floor, Coral Gables, FL 33134. Its registered agent is Maureen A. Ryan, Esq.  located at 5301 Blue Lagoon Drive, Suite 520, Miami, FL 33126. Defendants Vincens and Lemacon own and control JJR Investments, LLC. JJR Investments is not registered with the Georgia Secretary of State and does not have a registered agent in the State of Georgia. JJR Investments is a managing member of Viso Lasik Medspas, LLC.

26. **Defendant Lifestyle of Vision, Inc.** is incorporated under the laws of the State of Florida. It was incorporated on 13 September 2006. Its principal address is 9 Fairway Drive, Boynton Beach, FL 33436. Its registered agent is Salvatore De Canio, Jr. His address is 9 Fairway Drive, Boynton Beach, FL 33436. Its director is Salvatore De Canio, Jr. Lifestyle of Vision, Inc., is not

10

registered to do business in the State of Georgia and does not have a registered agent in Georgia. Lifestyle of Vision, Inc. is a managing member of Viso Lasik Medspas, Inc.

27. **Defendant NCMIC Corporation d/b/a Professional Solutions Financial Services ("NCMIC")** is a corporation existing under the laws of the State of Iowa. It was incorporated on 9 September 1993. Its registered agent is Patrick E. McNerney, 14001 University Ave., Clive, IA 50325. Its officers are Gregory Cole, Gary Hoffman, and Roger L. Schlueter. Its registered names in Iowa are NCMIC Finance Corporation, NFC Finance Corporation, and Professional Solutions Financial Services. NCMIC was registered to do business in Georgia on 18 December 2000. Its registered agent in Georgia is National Registered Agents, Inc., 3675 Crestwood Parkway, Suite 350, Duluth, Georgia 30096 in Gwinnett County.

28. NCMIC is not registered to do business in Georgia under the name Professional Solutions Financial Services.

29. NCMIC is in the business of providing financing for lease agreements and other credit-based transactions.

30. **Defendant Viso Lasik Medspas, LLC ("Viso Lasik")** is a limited liability company existing under the laws of the State of Florida. Its principal address

11

is 2332 Galiano St., Second Floor, Coral Gables, FL 33134. Its registered

agent is its registered agent is Maureen A. Ryan, Esq. , located at 5301 Blue

Lagoon Drive, Suite 520, Miami, FL 33126. Its managing members are

Lifestyle of Vision (9 Fairway Drive, Boynton Beach, FL 33437) and JJR

Investments, LLC (2332 Galiano St., Second Floor, Coral Gables, FL

33134). Viso Lasik Medspas, LLC is not registered in the State of Georgia

31. **Defendant Salvatore DeCanio, Jr. ("DeCanio")** is a resident and citizen of

the State of Florida. DeCanio is a stockholder and managing member of

Lifestyle of Vision, Inc.

## IV. FACTS REGARDING THE UNLAWFUL SCHEME

*Background information*

32. This case involves four primary parties: Brican, NCMIC, Viso Lasik, and

Plaintiffs.

33. Brican is in the business of selling and leasing an advertising system known

as the Exhibio System.

34. The Exhibio System consists of a 19-inch flat-screen television and

computer used as a digital advertising display. It is intended to be placed in

public areas such as doctors' waiting rooms or offices.

35. Viso Lasik is a company in the business of opening laser surgery centers

across the country.

36. Brican represented that it had an agreement with Viso Lasik for Viso to purchase advertising space from Brican for display on the Exhibio Systems.

37. Defendants Vincens and Lemacon share common control over both Brican and Viso Lasik.

38. Defendant DeCanio shares control of Viso Lasik with Vincens and Lemacon.

39. NCMIC is a financing company doing business in Georgia under the unregistered name Professional Services Financial Solutions. NCMIC is in the business of providing financing facilitate the purchase or lease of goods. NCMIC teamed with Brican in order to lease the Exhibio Systems to the Plaintiffs.

40. The Plaintiffs are individual optometrists in the State of Georgia. Plaintiffs leased Exhibio Systems from NCMIC based on fraudulent representations made by both Brican and Viso Lasik.

*Brican's Sales Pitch and relationship with Plaintiff*

41. Brican's sales representatives approached Plaintiffs individually with an offer to lease an Exhibio System. This system consisted of a 19-inch television and computer and would be used as an advertising device in Plaintiff's waiting room.

13

42. The Leasing Agreement offered by Brican provided that each Plaintiff would lease an Exhibio System for a term of 60 months at a rate of $508 per month. At the end of the term, the Plaintiff had an option purchase the Exhibio System for a nominal fee of $1.

43. Other options presented by Brican were to purchase the Exhibio System or a single payment of $22,000 or to lease it for a shorter term. All Plaintiffs opted for the 60 month payment option.

44. The Leasing Agreement required each Plaintiff to sign an unconditional personal guarantee. Each plaintiff signed this guarantee in his personal capacity.

45. Although the lease bore Brican's logo and letterhead and was presented by a Brican salesperson, the lessor was actually as Professional Solutions Financial Services. Professional Solutions Financial Services is the unregistered trade name of Defendant NCMIC Group, Inc.

46. Brican trained its sales representatives at its Florida offices.

47. Brican trained its sales representatives to market the Exhibio System as a "no cost" investment. Brican also marketed the Exhibio System as a "no cost" system via its website.

48. Brican trained its sales representatives to inform potential customers that

14

Brican had formed an agreement with Viso Lasik, and that Viso Lasik had agreed to purchase advertising space on the Exhibio Systems.

49. Brican represented to the Plaintiffs that Viso Lasik was in the business and process of opening laser eye surgery centers across the country.

50. It appeared to Plaintiff that Brican and Viso Lasik were independent entities. Thus, when Brican represented that it had an agreement with Viso Lasik that Viso Lasik would purchase advertising space from Brican, Plaintiff believed this was a legitimate venture.

51. At the time that representations were made, Brican did not have any agreement with Viso Lasik.

52. At the time those representations were made, Viso Lasik did not have the financial resources to purchase advertising space on the Exhibio Systems.

53. Nevertheless, Defendants Vincens, Lemacon, and DeCanio instructed Brican salespersons and employees to make false and misleading statements regarding Brican's agreements with Viso Lasik and Brican's ability and intention to purchase advertising space from Plaintiffs.

54. With the intention induce Plaintiff into the Leasing Agreement, Brican offered to enter into a separate Marketing Agreement.

55. Under the Marketing Agreement, Brican agreed to purchase advertising

space from Plaintiff for $5800 per year for the entire term of the lease.

56. Based upon the Brican salesperson's statements and the Marketing Agreement, the Plaintiffs believed that both Brican and Viso Lasik had the financial means to enable Brican to make these payments.

57. The Marketing Agreement also provided, "Cancellation: if Brican fails to honor its financial commitment pursuant to this agreement, the all related agreement can be cancelled and Brican will buy back the related lease agreement."

58. In summary, Brican's salesperson approached Plaintiffs and proposed the following: Plaintiff could lease an Exhibio System for $508 a month; in return, Brican would sign a Marketing Agreement and purchase advertising space from Plaintiff $5800 per year. Thus, lease payments due from Plaintiff totaled approximately $30,000, while advertising payments due to Plaintiff totaled approximately $27,000.

59. Given the payments incoming from Brican, warranted that the total cost of the system to the Plaintiff would be minimal.

60. Each Plaintiff entered into the Leasing Agreement and the Marketing Agreement.

61. Each Plaintiff received the Exhibio system through the mail, set it up, and

displayed the required advertisements, including advertisements for Viso Lasik.

62. In January 2010, Brican announced that it would not make any advertising payments to any lessee.

63. Brican also announced that it would not honor cancellation provision of the Marketing Agreement and would not repurchase Plaintiff's lease.

*Brican's relationship with NCMIC*

64. Throughout the course of the scheme, NCMIC did business under the unregistered corporate name "Professional Solutions Financial Services."

65. Prior to the Plaintiffs' involvement, in July 2005 NCMIC entered into a Vendor Agreement with Brican. Under that agreement, NCMIC agreed to accept the assignment of leases and to purchase Exhibio Systems from Brican for the purpose of leasing the same to Brican's customers. The Plaintiffs here were among those customers.

66. The relationship between NCMIC and Brican is a vendor relationship whereby NCMIC agreed to act as a funding source for equipment sold by Brican.

67. The Leasing Agreement used by NCMIC and Brican is a finance lease under Article 2A of the Uniform Commercial Code. In a finance lease, defects to

17

the leased product do not run to the financing party; i.e., if the product breaks or does not perform as promised, the lease with the financing party is unaffected. This sort of clause in a lease also known as a "hell or high water" clause.

68. This form of lease was used to take advantage of the Plaintiffs' lack of contract and legal experience. Under Georgia law, these Leasing Agreements would not be governed by Article 2A, but rather by Article 9 of the Uniform Commercial Code.

69. The only reason NCMIC receives the benefit of the "hell or high water" clause is because NCMIC wrote the contracts to be governed under Article 2A.

70. NCMIC agreed to purchase each lease from Brican. Each lease was worth approximately $30,000, and NCMIC agreed to purchase each for an upfront payment of $24,000.

71. NCMIC paid a total of approximately $38 million to Brican and financed over 1600 leases.

72. Neither Brican nor NCMIC maintained any inventory of Exhibio Systems. Each unit was shipped directly to each lessee from the manufacturer.

73. NCMIC was aware that the maximum value of the goods being leased was

18

approximately $3500 and that the lessees entered into the Leasing Agreements based on Brican's promise to make payments under the Marketing Agreements.

74. Vincens, on behalf of Brican, advised Fred Scott of NCMIC of Brican's intention to utilize both the Advertising and Marketing Agreements in its dealings with the class members.

75. Scott Cook of NCMIC had knowledge of the Marketing Agreements in July 2008.

76. No representative from NCMIC voiced an objection to the use of the Marketing Agreements, in spite of the fact that the Marketing Agreement included a cancelation clause.

77. Due to the gross disparity in value of the goods and the lease price, NCMIC knew or should have known that the Marketing Agreements and Brican's promise to pay quarterly advertising fees induced the class members to enter into the Leasing Agreement.

78. In spite of this knowledge, NCMIC did not attempt to amend its Vendor Agreement with Brican; it thereby ratified the cancelation provision of the Marketing Agreement between Brican and the class members.

79. NCMIC knew that Brican was receiving $24,000 in upfront payment from

19

NCMIC and that Brican was simultaneously obligating itself to pay nearly $27,000 to each lessee under the Marketing Agreements. In spite of this disparity, NCMIC did not investigate whether Brican or Viso Lasik had the resources available to make these payments. Instead, NCMIC knowingly participated in the scheme to defraud the class members.

*NCMIC withdraws from the scheme*

80. In the first four months of 2009, 70% of all of NCMIC's business was done with Brican.

81. On 15 April 2009, NCMIC declared that it would not purchase any more leases from Brican and withdrew from the scheme.

82. In May 2009, NCMIC filed suit against Brican. That suit was settled out of court and the terms of the settlement have not been disclosed to Plaintiffs.

83. On 17 April 2009, Vincens and Lemacon created Brican Financial Services, Inc. to take the place of NCMIC. Brican then continued entering into leases obligating it to pay the Plaintiffs approximately $5800 per year in exchange for the Plaintiffs' payments of $508 per month.

84. Unlike the leases assigned to NCMIC, Brican could not generate an upfront payment for these leases. That is, with yet another funding source removed, Brican still entered into more leases with the full knowledge that it could not

pay the lessees as required under the Marketing Agreement.

85. In January 2010, Brican publicly announced that it would no longer make any advertising payments to the Plaintiffs. In the same statement, Brican encouraged the Plaintiffs to continue making payments to NCMIC.

*The Fraud*

86. This fraud is made clear by examining Brican's actual business activities. Brican entered into approximately 1600 leases. Under these leases, Brican promised to pay each lessee approximately $5800 per year in advertising fees for the entire course of the lease. The leases were for five years each. Thus, Brican was obligated to pay Plaintiffs approximately $46,400,000 over 5 years.

87. Brican assigned its leases to NCMIC for a price of $24,000 each. Brican was paid approximately $38,400,000 for these leases.

88. Brican obligated itself to pay Plaintiffs $8,000,000 more than it received as payment from NCMIC (46,400,000 minus 38,400,000 equals $8,000,000).

89. In order to recoup this loss, Brican would have to expect Viso Lasik to pay Brican $8,000,000 to purchase advertising space from Brican.

90. Viso Lasik never made a payment to Brican for the advertising shown on the Exhibio Systems.

21

91. Brican never attempted to secure any other source of advertising revenue.

92. Brican never had another source of income, and never intended to find another source of income, and never intended, in spite of its representations, to make advertising payments to the Plaintiffs.

93. There is simply no revenue source, through Viso Lasik or elsewhere, by which Brican could pay, or ever planned to pay, the Plaintiffs each $5800 a year for the term of the five-year lease, or a total of approximately $37,000,000 in payments.

94. Plaintiffs contend each Brican company was created in order to organize a scheme which generated millions of dollars in profits for Vincens, Lemacon, and DeCanio.

95. The end results of the scheme are that: (1) Brican has been paid $38,000,000 by NCMIC; (2) the only way for NCMIC to recoup its payment to Brican is to require the Plaintiffs to continue lease payments; and (3) the Plaintiffs are left paying $30,000 to NCMIC for $3000 equipment.

96. In January 2010, Brican declared its insolvency.

*A blueprint for fraud: the Recomm Scheme.*

97. The fraudulent scheme enacted by Vincens and Lemacon followed a similar scheme enacted by Vincens in 1991. The commonality of these schemes

22

establishes a modus operandi and reveals that Vincens and Lemacon had full knowledge of the consequences of their plan.

98. From 1991 to 1995, Defendant Vincens operated a number of interrelated corporations and limited liability companies. These companies included Recomm Operations, Inc., Recomm International Display Corp., Inc., Optical Technologies, Inc., Automated Travel Center, Inc., Recomm Enterprises, Inc., Recomm International Display, Ltd. and Recomm International Corporation.

99. In this case, Vincens and Lemacon formed a number of companies under the name Brican.

100. The Recomm companies were involved in the business of leasing advertising equipment to pharmacies, veterinarians, optometrists, and other individuals. The equipment consisted of electronic display boards and interactive digital kiosks.

101. In this case, Brican is involved in leasing similar advertising equipment to dentists, optometrists, chiropractors, and other medical professionals.

102. Recomm induced the lessees to enter into a lease agreement for the display boards with a promise that Recomm would share a portion of the advertising revenue with the lessees. Recomm planned to generate this advertising

revenue by selling ad space on the display kiosks.

103. In this case, Brican made similar promises to share advertising revenue with the lessees of the Exhibio Systems.

104. The lessees did not purchase the equipment; rather, they entered into finance leases with Recomm. Recomm, in turn, sold these leases to unrelated financing companies for an upfront payment.

105. In this case, The Plaintiffs here entered into financing leases with NCMIC, an unrelated company. Like the Recomm scheme, the financing company made an upfront payment for assignment of the leases.

106. The process of paying earlier investors with proceeds derived from later investors sustained itself for a time; Recomm was able to make advertising payments to the lessees so long as it generated sufficient revenue from subsequent investors.

107. In this case, Brican was able to make advertising payments to early lessees by using proceeds derived from subsequent lease agreements.

108. 1995, Recomm ceased making advertising payments to the lessees.

109. In this case, Brican made advertising payments for a period of time and eventually ceased.

110. The lessees were thereby deprived of the benefit of their bargain

because advertising fees were no longer forthcoming. Because the leases were held by an unrelated company, however, the lessees were left without recourse against Recomm.

111.     In this case, The Plaintiffs were deprived of the benefit of their bargain because the advertising fees were never paid. Because the Plaintiffs' Leasing Agreements are held by an unrelated company.

112.     The effect of this scheme was that Recomm generated substantial revenue from the sale of the leases to third-party financing companies and had no continuing liability to either the lessee or lessor.

113.     In this case, The effect of the scheme here is that Brican generated substantial revenue from the sale of leases to a third-party financing company.

114.     Plaintiffs allege that both of these schemes were concocted and perpetrated by Jean-Francois Vincens. Both schemes constituted a Ponzi scheme whereby investors were deprived of substantial sums of money.

## V. CLASS ACTION ALLEGATIONS

115.     Plaintiffs request that this Court certify the following class of individuals: All individuals in Georgia who entered into contracts with any of the Defendants for the lease or purchase of a, Exhibio System and who

also entered into a marketing agreement with Brican Inc., Brican LLC, or any other related company.

116. **Numerosity.** Under Rule 23 of the Federal Rules of Civil Procedure, the main class consists of over 1600. Joinder of each of these claims is impracticable because of the sheer number of class members. There are currently 13 plaintiffs participating

117. **Commonality.** Each claim by each Plaintiff presents common questions of fact and law. Each Plaintiff entered into the same or similar lease and marketing agreement. The relationship between the named Defendants and each individual Plaintiff is virtually identical. The fraud perpetrated on the class representatives is the same in form and substance as the fraud perpetrated upon the class members. Failing to certify this as a class action would risk inconsistent results

118. **Typicality.** The claims by the class representatives are typical of the claims asserted by all other class members, and the relief sought by the class representatives is typical of the relief sought by each class member.

119. **Adequacy.** The class representatives will adequately represent the interests of all class members. The class representatives have retained competent counsel experienced in such litigation.

26

120.     **Superiority**. Class representation in this case represents the most

efficient and most fair form of resolution of the case.

### VI. ALTER EGO ALLEGATION

121.     **Alter Ego allegation as to Defendants Vincens, Lemacon, DeCanio,**

**Brican Inc., Brican LLC, Brican Financial, JJR Investments, Lifestyle**

**of Vision, and Viso Lasik.** As the owners and operators of each Brican,

Vincens and Lemacon have intermingled ownership and control, and

disregarded corporate formalities. Each entity has treated assets of the others

as its own, and each entity was under-capitalized and unable to meet its

financial obligations from its inception. All actions undertaken by Brican,

Lemacon, or Vincens were made with the knowledge, consent, and

ratification of the others. As such, adherence to the fiction of these separate

corporate entities would allow Defendants to propagate a fraud upon the

class members and would promote a manifest injustice.

### VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Money Damages and Injunctive Relief for violation of the Georgia
Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-
1, et. seq. and the United States RICO Act, 18 U.S.C. § 1961-1968**

**Against Brican LLC, Brican Inc., Brican Financial Services, Jacques**

### Lemacon, Jean-Francois Vincens

122.     Plaintiffs incorporate by reference all allegations contained in all preceding paragraphs.

123.     The business entities Brican Inc., Brican LLC, Brican Financial Services, JJR Investments, Viso Lasik Medspas, and NCMIC individually and collectively, constitute an "enterprise".

124.     Defendants committed **mail fraud** by violating 18 U.S.C. § 1341.

125.     The first fraud resulted from the misrepresentation of Brican's relationship with Viso Lasik Medspas as a viable business relationship. A second fraud resulted from the offer of Brican to repurchase the lease agreements from the Plaintiffs if Brican failed to make the advertising payments.

126.     These representations were made by Brican sales people at the time that the contracts were entered into; these representations are further contained in each of the contract signed by Plaintiffs.

127.     Both of these statements were false at the time they were made to Plaintiffs.

128.     Plaintiffs reasonably and justifiably relied on said representations.

129.     The sole motive for misrepresenting this relationship was to induce

28

the Plaintiffs and others to enter into Leasing Agreements. From the beginning of the scheme, no party intended to honor its commitments; nevertheless, each Defendant knew that such commitments were being used to induce Plaintiffs to enter into the Leasing Agreements.

130. Defendants made extensive use of the mail, including the United States Postal Service.

131. Each Exhibio system arrived at the Plaintiffs' offices via UPS. Shipment via UPS constitutes "use of the mails" under 18 U.S.C. § 1341.

132. Such use of the mail was a foreseeable and inevitable consequence of the scheme.

133. Defendants committed **theft by deception** because each participated in a scheme which created or conformed to the Plaintiffs' false impression about an existing fact, namely, that Brican had an intention to honor its contractual commitment and had an existing and viable agreement with Viso Lasik.

134. These repeated criminal acts constitute a pattern of racketeering activity because they are have the same intents, results, accomplices, and methods of commission. They are all part of a single scheme to defraud.

135. Through this pattern of racketeering activity, Defendants acquired and

maintained an interest in their collective enterprise.

136.     Through this pattern of racketeering activity, Defendants unlawfully received substantial sums of money.

137.     As a result, Plaintiffs suffered substantial injury to their business and property.

138.     Plaintiffs hereby request compensatory and treble damages against all Defendants found to have violated the Georgia and United States RICO Acts.

139.     Plaintiffs hereby request punitive damages against all Defendants found to have violated the Georgia and United States RICO Acts.

140.     Plaintiffs hereby request injunctive relief against all Defendants and ask that this Court declare that each Defendant be divested of any interest acquired through the scheme, including any and all contractual rights.

## SECOND CLAIM FOR RELIEF

**Money Damages and Equitable relief for Conspiracy to violate the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1, et. seq. and the United States RICO Act, 18 U.S.C. § 1961-1968**

**Against Brican LLC, Brican Inc, Brican Financial, Jean-Francios Vincens, Jacques Lemacon, Salvatore DeCanio, Lifestyle of Vision, JJR Investments, and Viso Lasik**

141.    Plaintiffs incorporate by reference all allegations contained in all preceding paragraphs.

142.    Defendants conspired among themselves in order to further a pattern of racketeering activity for the purpose of depriving Plaintiffs of substantial sums of money and causing substantial injury to each.

143.    Viso Lasik, though its agents and owners, was aware that Brican warranted that an agreement existed whereby Viso Lasik would purchase advertising space from Brican's customers. Viso Laisk, though its agents and owners, knew know such agreements existed.

144.    Each Defendant knew at the time of his involvement that he was participating in an illegal scheme and that part of that scheme was perpetrating a fraud upon the Plaintiffs.

145.    Each Defendant took substantial steps in furtherance of that scheme.

146.    Plaintiffs hereby request compensatory and treble damages against all Defendants found to have violated the Georgia and United States RICO Acts.

147.    Plaintiffs hereby request punitive damages against all Defendants found to have violated the Georgia and United States RICO Acts.

148.    Plaintiffs hereby request injunctive relief against all Defendants and

31

ask that this Court declare that each Defendant be divested of any interest acquired through the scheme, including and contractual rights.

## THIRD CLAIM FOR RELIEF

**Money Damages and Rescission for Fraudulent Misrepresentation**

**Against Brican, Inc. and Brican, LLC**

149.    Plaintiffs incorporate by reference all allegations contained in all preceding paragraphs.

150.    Defendants made certain representations to Plaintiffs which were false at the time they were made.

151.    The misrepresentations included the fiction that Brican's relationship with Viso Lasik Medspas as a viable business relationship, and the fiction that Brican would repurchase the lease agreements from the Plaintiffs if Brican failed to make the advertising payments.

152.    These statements were made by Brican salespersons at the time the contracts were entered into.

153.    Defendants were aware of the falsity of those statements at the time they were made.

154.    Defendants intended each Plaintiff to rely on such statements.

155.    Plaintiffs justifiably relied on those representations.

156.     Plaintiffs were damaged as a result of their reliance upon the

Defendants' statements.

157.     Plaintiffs hereby request that this Court declare all Leasing

Agreements void and unenforceable.

158.     Plaintiffs hereby request that this Court award compensatory damages.

159.     Plaintiffs hereby request an award attorney's fees for all costs

associated with bringing this lawsuit.

160.     Plaintiffs hereby request punitive damages against any Defendant

which engaged in such misrepresentations.

## FOURTH CLAIM FOR RELIEF

**Money Damages and Declaratory Relief for Breach of Contract**

**Against Brican Inc., Brican LLC, Brican Financial and NCMIC**

161.     Plaintiffs incorporate by reference all allegations contained in all

preceding paragraphs.

162.     Brican violated its contractual obligations under the Marketing

Agreements between it and the Plaintiffs because Brican refused to

repurchase Plaintiffs' Leasing Agreements after it failed to remit quarterly

advertising payments are required.

163.     NCMIC violated its contractual obligations with Plaintiffs because it

33

failed to repurchase the Leasing Agreements after NCMIC ratified the
provision of the Marketing Agreements requiring the that the leases be
repurchased upon demand by Plaintiffs.

164.    Both Brican and NCMIC violated the duty of good faith and fair
dealing which is implied in contracts under the Uniform Commercial Code.

165.    Plaintiffs hereby request that money damages arising from said breach
be awarded as this Court deems proper.

166.    Plaintiffs have genuine doubt as to their contractual rights and
obligations under the Leasing Agreements and Marketing Agreements.

167.    NCMIC has threatened to sue any Plaintiff who does not continue to
make monthly payments under the Leasing Agreement.

168.    Plaintiffs hereby request that this Court declare Plaintiffs free from
future contractual obligation to NCMIC or any other holder of the Leasing
Agreement.

169.    Plaintiffs hereby request compensatory damages arising from
Defendant Brican's breach of contract.

170.    Plaintiffs also request that this Court declare that Brican is in default
of its obligation to repurchase Plaintiffs' Leasing Agreements and order
Brican to repurchase said agreements.

## FIFTH CLAIM FOR RELIEF

### Equitable relief for Unjust Enrichment

### Against all Defendants

171.     Plaintiffs incorporate by reference all allegations contained in all

preceding paragraphs.

172.     Each Defendant benefitted from the unlawful scheme used to defraud

Plaintiffs and it would be inequitable for any Defendant to retain the benefit

of the proceeds derived from Plaintiffs' lease payments.

173.     Plaintiffs hereby request this Court order that Defendants divest

themselves of any funds received from Plaintiffs and return those funds to

the Plaintiffs as equity requires.

174.     Plaintiffs hereby request that this Court provide injunctive relief

against the future enforcement of the Leasing and Marketing Agreements.

## SIXTH CLAIM FOR RELIEF

### Cancellation of contracts and Damages due to Unconscionability

### Against Brican, LLC, and Brican, Inc. and NCMIC

175.     Plaintiffs incorporate by reference all allegations contained in all

preceding paragraphs.

176.     Plaintiffs allege that if all underlying facts were disclosed at the time

35

of the signing of the Leasing Agreements and Marketing Agreements, no reasonable person would have entered into the contracts.

177.     There was a disparate bargaining position between Defendants NCMIC and Brican, who were well-versed in equipment leasing and advertising and the Plaintiffs.

178.     The contracts cited portions of the Uniform Commercial Code which Plaintiffs could not have reasonably understood.

179.     The contract terms obligate Plaintiffs to pay approximately $30,000 for equipment worth only $3,000.

180.     The contracts were created by Defendants and used pre-printed boilerplate language.

181.     All contractual risk was unjustifiably allocated to the Plaintiffs.

182.     Plaintiffs hereby request that this Court declare all contracts entered into with Brican, NCMIC, and declare Plaintiffs free from any further obligation.

183.     Plaintiffs hereby request this Court award compensatory damages.

## SEVENTH CLAIM FOR RELIEF

**Injunctive relief and damages for Violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-730, et. seq. and the 15 U.S.C. § 45**

**Against all Defendants**

184.    Plaintiffs incorporate by reference all allegations contained in all preceding paragraphs.

185.    By making the above-referenced misrepresentations, Defendants have created confusion as to the source, sponsorship, and approval of the Exhibio System and the advertising which would be conducted on it.

186.    NCMIC participated in the deception by trading under an unregistered trade name and using a contract bearing the Brican and presented by a Brican sales person.

187.    By making the above-referenced misrepresentations, Defendants have caused confusion as to the affiliation, connection, and association between Brican, NCMIC, and Viso Lasik.

188.    By making the above-referenced misrepresentations, Defendants have represented that the Exhibio System and advertising plan had the sponsorship and approval of Viso Lasik. This sponsorship and approval did not in fact exist.

189.    Plaintiffs hereby request that this Court provide injunctive relief against the enforcement of the Leasing Agreements which arose from these deceptive practices.

190.     Plaintiffs hereby request that this Court award all costs and attorney's

fees resulting from bringing this lawsuit.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray that this Court enter a judgment
declaring the following:

1. That the class action is proper and for it to be certified as such
   under Rule 23 of the Federal Rules of Civil Procedure
2. That Defendants violated the Georgia Racketeer Influenced
   and Corrupt Organizations Act.
3. That Defendants conspired to violate the Georgia Racketeer
   Influenced and Corrupt Organization Act.
4. That Defendants breached both the Marketing and Leasing
   Agreements.
5. That Defendants violated the Fair Business Practices Act
6. Plaintiffs are entitled to an award of punitive and exemplary
   damages against Defendants
7. Plaintiffs are entitled to an award of costs, interest, expenses,
   and attorney's fees necessary for bringing and prosecuting
   this action.
8. Plaintiffs are entitled to an award of treble damages.
9. Plaintiffs are entitled to equitable relief
10. Plaintiffs are entitled to injunctive relief
11. Whatever other relief this Court deems appropriate.

## IX. JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby

demand a trial by jury for all triable causes of action.

38

Aubrey T. Villines, Jr.
Georgia Bar No. 727750
Attorney for Plaintiffs

Jeffrey R. Filipovits
Georgia Bar No. 825553
Attorney for Plaintiffs